IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ADAN B. CARDENAS,

      Plaintiff,

vs.                                                                      No.  02cv1169 MV/DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

MAGISTRATE JUDGE'S PROPOSED FINDINGS
AND RECOMMENDED DISPOSITION

This matter is before the Court on Plaintiff's (Cardenas') Motion to Reverse or Remand

Administrative Agency Decision **[Doc. No. 7]**, filed April 9, 2003, and fully briefed on August 27,

2003.  The Commissioner of Social Security issued a final decision finding Cardenas had

experienced medical improvement related to the ability to perform work, affirming the prior

determination that Cardenas was no longer disabled effective June 1, 2001, and affirming the prior

determination that Cardenas' disability insurance benefits be terminated effective August 1, 2001.

Having considered the arguments, pleadings, administrative record, relevant law, and being

otherwise fully informed, the Court finds the motion to reverse and remand for a rehearing is not

well taken and recommends that it be DENIED.

## I.  Factual and Procedural Background

Cardenas, now fifty years old, filed his application for disability insurance benefits and

supplemental security income on October 8, 1992, alleging disability since July15, 1991, due to

low back pain from a work related injury.  On June 7, 1994, Cardenas was awarded disability

insurance benefits and supplemental security income from July 15, 1991 through June 1, 2001.  In

June 2001, the agency initiated a continuing disability review, concluding that Cardenas' health

had improved and he could return to work.[1]   On June 13, 2001, the agency notified Cardenas that

his benefits were being terminated.  Tr. 195.  In response, Cardenas alleged that he remained

disabled due to diabetes and back pain.  *Id.*  On April 12, 2002, the Administrative Law Judge

(ALJ) issued his decision, finding Cardenas had undergone medical improvement related to the

ability to do work beginning June 1, 2001.  Tr. 18.  The ALJ also found Cardenas was not totally

credible regarding his alleged limitations.  *Id.*  Cardenas filed a Request for Review of the decision

by the Appeals Council.  On July 25, 2002, the Appeals Council denied Cardenas' request for

review of the ALJ's decision.  Hence, the decision of the ALJ became the final decision of the

Commissioner for judicial review purposes.  Cardenas seeks judicial review of the

Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether he applied correct legal standards.

*Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395

(10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record

---

[1] After a claimant has been awarded disability benefits, the Commissioner is required to
review the case periodically to determine whether there has been any medical improvement in the
claimant's condition and whether that improvement affects the claimant's ability to work.  20
C.F.R. § 404.1594(a).

or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence,"

*Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence

of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291

(10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must

discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative

evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while

the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States*

*Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must

meticulously examine the record as a whole, including anything that may undercut or detract from

the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington*

*v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

An eight-part sequential evaluation process is used in termination reviews.  See 20 C.F.R.

§ 404.1594(f)(1) through (8).  This evaluation includes the following:

1.  Is beneficiary performing any work constituting substantial gainful activity?

2.  Does current impairment meet or equal listed impairment?

3.  Has there been medical improvement? [2]

---

[2] Medical improvement under the regulations is defined as:

Any decrease in the medical severity of your impairment(s) which was present at
the time of the most recent favorable medical decision that you were disabled or
continued to be disabled.  A determination that there has been a decrease in
medical severity must be based on changes (improvement) in the symptoms, signs
and/or laboratory findings associated with your impairment(s).

4. If so, is it related to the claimant's ability to do work, i.e., has there been an increase in the residual functional capacity (RFC) based on the impairment(s) present at the time of the most recent favorable medical determination?

5. If there has been no medical improvement, or if such improvement is not related to claimant's ability to work, do any of the exceptions to medical improvement apply? (see 20 C.F.R. 404.1594(d)-(e) for list of exceptions.)

6. If the medical improvement is related to ability to do work, or if one of the exceptions found in 404.1594(d) apply, then are all the current impairments in combination severe?

7. Considering all current impairments, does beneficiary have sufficient RFC to do past relevant work?

8. In addition, considering age, education, and other past work experience, does beneficiary have sufficient RFC to perform other work?

20 C.F.R. § 404.1594(f)(1) through (8). The Commissioner bears the burden of showing medical improvement by establishing that the claimant's medical condition has improved, the improvement is related to the claimant's ability to work, and the claimant is currently able to engage in substantial gainful activity. *Glenn v. Shalala*, 21 F.3d 983, 987 (10th Cir. 1994). In deciding whether to terminate benefits, a claimant's impairments are considered together. *See* 20 C.F.R. § 404.1594(d).

Cardenas was originally found to have a severe impairment of his back due to lumbar disc disease at L4-5 and L5-S1. Tr. 154. The ALJ reviewed the medical evidence and concluded the evidence demonstrated that Cardenas' back condition had significantly improved. Tr. 19.

---

20 C.F.R. § 1594(b)(1).

The ALJ then found Cardenas' impairments had medically improved as of June 1, 2001.  *Id.*  The ALJ assessed Cardenas' current residual functional capacity (RFC) and determined Cardenas could perform light work.  *Id.*

In support of his motion to reverse and remand for a rehearing, Cardenas advances the following arguments: (1) the ALJ's decision is not supported by substantial evidence; (2) the ALJ failed to give the appropriate weight to the opinion of the treating physician; (3) the ALJ failed to follow applicable standards in arriving at his decision; and (4) the ALJ failed to appropriately address the issue of whether any jobs exist in the economy that he is capable of doing.

**A.  The ALJ's Decision is Supported by Substantial Evidence**

Cardenas contends the ALJ's decision that he is not disabled is not supported by substantial evidence.  According to Cardenas, the record as a whole "clearly demonstrates the persistence of [his] disability."  Pl.'s Mem. in Supp. of Mot. to Reverse or Remand at 20.   In support of his position, Cardenas cites to page 325 of the record and claims that on January 10, 2001, Dr. Hiring, a chiropractor, noted that he was still suffering from lower back pain and stiffness in his right quadriceps.  *Id.*  However, the evidence reflects that Cardenas saw him for acute lower back pain on July 18, 2000, and Dr. Hiring made some "adjustments."  Tr. 325.  On July 21, 2000, Cardenas returned to Dr. Hiring and reported he was feeling much better.  *Id.* Cardenas did not return to see Dr. Hiring until January 10, 2001.  *Id.*  On that day, Dr. Hiring noted "LBP & stiff hyper Rt quad lumborum (?)."  *Id.*   There are no further visits to Dr. Hiring.

In his decision, the ALJ found that Cardenas had experienced medical improvement and cited to the evidence.  The ALJ found:

> The claimant's testimony and reports of symptoms and functional restrictions was not
> supported by the evidence overall in the disabling degree alleged, and therefore lacked

credibility.  At his hearing before me the claimant testified that he has chronic back pain radiating down his legs.  However, during his consultative examination in May 2001 he reported that he had no leg pain.  He also testified that his right arm and shoulder are painful and he experiences restricted ranges of shoulder motions.  However, his medical records indicate that he underwent arthroscopic surgery in February 1999, and that he reported to his doctor that he had good results and restoration of his ranges of motion.  By December 1999 the claimant was reporting that he was working quite a bit laying cement, and he stated that he felt well.  His clinical examination at that time was normal.  In December 2000 the claimant reported that he had minimal pain in his right shoulder and good ranges of motion.  He made no complaints and stated that he felt well.  In May 2001 the claimant's doctor wrote that he was continuing to work out and was keeping active, and that he had no complaints.  His behavior has been inconsistent with his reports and testimony of symptoms and functional restrictions.  During that period, the claimant's clinical examination showed that he had good mobility in his shoulders and upper extremities, and he had normal upper extremity function.

Although the claimant testified that he does no housework or yardwork, he reported during his consultative examination in May 2001 that he did light household chores.  Moreover, although the claimant testified to severely restricted ranges of back motion and his consultative clinical examination found that he was unable to bend forward more than 30 degrees, that examination also indicated that the claimant voluntarily restricted himself to that range of bending.  The claimant's lumbar x-rays revealed no significant abnormalities, and his lumbar MRI revealed only mild disc disease.  Such mild diagnostic abnormalities do not support the degree of difficulty the claimant alleges due to his back and legs.  At the time the claimant visited his doctor in June 2001, his doctor noted that he had not been in for some time.  The claimant reported that he was taking only over the counter medication for pain, and his doctor did not prescribe any pain medications.

The claimant underwent medical improvement as of June 1, 2001.  At the time he was placed in disability status he had sustained a low back injury, he was experiencing severe back pain and pain radiating into his legs, he had marked restrictions of shoulder motions, he was having difficulties sleeping due to pain, he was unable to maintain any postural position, and he was unable to do any significant bending and lifting.  The evidence substantiates that he has currently been doing cement work, which involves bending and at least light lifting, that he performs light household chores, that his shoulder surgery restored his ranges of motion, and that his back condition is mild.  He had been working out and keeping active.  His treatment records indicate that he has reported he is feeling fine to his doctor on a regular basis.

Tr. 18-19 (citations to record omitted).

Cardenas' medical records from his treating physicians at University Hospital Department of Orthopedics and Department of Internal Medicine support the ALJ's finding that there has been medical improvement.

6

**Summary of the Medical Evidence**

On **August 13, 1999**, Dr. Blevins, Associate Professor of Orthopedics, evaluated Cardenas for right shoulder adhesive capsulitis.[3]  Tr. 322.  Dr. Blevins noted Cardenas had undergone a right shoulder arthroscopy with manipulation for lysis of adhesions for right glenohumeral adhesive capsulitis in February of 1999.  Cardenas reported he was working hard to get his motion back and reported he was quite satisfied with his recovery and "he [was] even starting to work a little bit more."  *Id.* (emphasis added).  Dr. Blevins physical examination indicated as follows:

> PHYSICAL EXAM:    He has forward flexion to 160 degrees, and abduction to 130 degrees.  This is dramatic improvement over the last visit, where his forward flexion was only 120 degrees.  He has internal rotation to L2, and external rotation remains quite limited at 5 degrees.  He is neurovascularly intact to the upper extremity with regard to light touch sensation, two point discrimination, and capillary refill.  His pulses in the radial and ulnar nerves are also excellent.  His light touch sensation on the bilateral cutaneous nerve is also intact.

*Id.* (emphasis added).  Dr. Blevins advised Cardenas to follow up only as necessary.

On **September 2, 1999**, Dr. Fred Hashimoto, Professor of Medicine in the Department of Internal Medicine and in the Division of General Medicine, evaluated Cardenas.  Tr. 320-321.  Cardenas reported "he [was] doing well and has no complaints."  Tr. 320.  Cardenas also reported "his shoulder pain with physical therapy and continued movement [was] improving.  He has less pain and more range of motion."  *Id*.  Dr. Hashimoto noted:

> PROBLEMS:
> 1.      Diabetes mellitus
> 2.      Hyperlipidemia

_____

[3] Adhesive Capsulitis is a condition in which there is limitation of motion in a joint due to inflammatory thickening of the capsule, a common cause of stiffness in the shoulder.  *Stedman's Medical Dictionary* 273 (26th ed. 1995).

3.      Erectile dysfunction
4.      Right shoulder capsulitis status repair with pain
5.      Mild spinal stenosis in two areas in cervical spine[4]

PHYSICAL EXAMINATION:  Blood pressure 112/72, weight 163 pounds, pulse 94, temperature 97.5.  He is on 93% on room air.  Generally this is a well nourished, thin Hispanic male in no acute distress.  Head, eyes, ears, nose, throat: neck is supple without adenopathy.  Normal thyroid.  Lungs were clear to auscultation bilaterally.  Heart is regular rate and rhythm, normal S1, S2.  Extremities: he has 2+ dorsalis pedis pulses bilaterally.  Hair on toes.  Normal sensation to light touch in all five areas on the soles of the feet bilaterally.

LAB:  6/99: hemoglobin A-1C 9.4, cholesterol decreasing with Lipitor of 10 mg of 166, HDL 57, LDL 102.  Albumin and liver function tests were normal.  His micro albumin/creatinine ratio was 3 which is normal as long as it's less than 20.  He had C5-C6 disc narrowing and also C3-C4 disc narrowing.

ASSESSMENT & PLAN:
1. Diabetes mellitus.  Will check today's hemoglobin A-1C to see if we need to      increase the  Glucophage to 1,000 mg bid.  Will refer for an eye appointment. The patient at this point has no sequelae of diabetes which is good news.
2. Hypertension.  Not an issue.  The patient does not have hypertension.  He has no need for ACE inhibitor at this time and does not have proteinuria.
3. Erectile dysfunction.  Will give more Viagra at this visit.
4. Status Post right shoulder capsulitis.  Will give a few more Tylenol #3.  The patient denies taking them every day.  He states that he needs them occasionally but otherwise is doing well with moving his arms and is pleased with his improvement.  We did discuss sending him to the Pain Clinic, however he denies any paresthesias or numbness or weakness of his hands and therefore did not think it was appropriate to refer him at this time.  The patient was told to continue to do his exercises of his hands.
5. Smoking: patient states he only smokes one pack of cigarettes every four days.  He is still in the process of trying to quit, however this is much improved over one pack per day.  His treatment is overall getting much better.
6. Disposition: return to clinic in another three months with another hemoglobin A-1C.

Tr. 320-321 (emphasis added).

On **December 7, 1999**, Cardenas returned to Univesity Hospital Division of General

Medicine for a follow-up visit.  Tr. 318.  Dr. Carolyn Voss, Associate Professor of Medicine,

---

    [4] Although the physician's medical notes indicate "mild spinal stenosis in two areas in cervical spine," Cardenas' medical history indicates his problem is with the lumbar not cervical spine.  *See* Tr. 345.

8

evaluated Cardenas.  Dr. Voss noted Cardenas took Tylenol No. 3 <u>as needed</u> for shoulder pain.

Dr. Voss noted:

> HISTORY OF PRESENT ILLNESS:  The patient is a 46-year-old male with the above
> problems (diabetes mellitus, hyperlipidemia, erectile dysfunction, right shoulder capsulitis
> status post repair with pain, and mild spinal stenosis in 2 areas of cervical spine) who
> comes in today for a follow-up visit. <u>He has no complaints.  He states he is doing well.  He
> feels that he has been working quite a bit laying cement and he states he feels well.</u>  He is
> able to move his shoulder much more.  <u>He continues to do his exercises and has no
> complaints.</u>  He states that he checks his sugars in the morning and they are around 130.
> He does forget to bring in a sheet with listings.

Tr. 318 (emphasis added).  The physical examination was essentially unremarkable.  Tr. 318-319.

Dr. Voss found Cardenas' diabetes and hyperlipidemia well controlled.  Tr. 319.  Dr. Voss

instructed Cardenas to return in three months.

On **March 7, 2000**, Cardenas returned to University Hospital Division of General

Medicine for his three month follow-up visit.  Tr. 316-317.  Cardenas reported "he <u>continues to

work well and his shoulder pain is almost gone</u>."  Tr. 316 (emphasis added).  Cardenas had "no

complaints."  *Id.*  The physical examination was unremarkable.  Dr. Voss noted Cardenas'

diabetes and hyperlipidemia were <u>well controlled</u> and made no changes.  Tr. 317 (emphasis

added).  Dr. Voss instructed Cardenas to return in three months.

On **May 16, 2000**, Cardenas returned to University Hospital Division of General Medicine

for his follow-up visit.  Tr. 312-314.  Dr. Dana Fotieo, Assistant Professor of General Medicine

evaluated him on that day.  Cardenas complained that he had left elbow pain.  Dr. Fotieo noted:

> The patient is a 46-year-old male with the above problems who comes today for a follow-
> up visit.  <u>He has no complaints</u>.  He states that his sugars in the morning are usually
> around 115-130.  He states that today they were a little bit elevated as he had a coco-cola
> which is not his norm.  He has no polydipsia or polyuria and no neuropathy.
> The patient does complain that he has a left lateral condyle pain which basically hurts only
> with pressing it.  However, he does state that this has been going on since about
> November.  He does not recall bumping it or anything, but he states that it is a little bit

9

annoying, but he is able to work well of (sic) [to] lay bricks. He states that the arm hurts more when he extends it, tends to not hurt when the elbow is flexed. The patient also has a lipoma on his right lower chin which he would like evaluated and removed for which he has asked for a consult.

Tr. 312-313 (emphasis added). Cardenas' physical examination was essentially normal except for left elbow tenderness over the lateral condyle projection. Tr. 313. Dr. Fotieo noted "mild spinal stenosis in two areas of the cervical[5] spine, asymptomatic." Tr. 312 (emphasis added). Dr. Fotieo assessed Cardenas as "well controlled diabetic male without any complaints" and "left lateral condyle pain." Id. (emphasis added). Dr. Fotieo opined the left elbow pain "[m]ost likely represents repetitive strain." Id. Dr. Fotieo noted, "I explained to the patient that he would be best to ice this 2x a day for 20 minutes at a time. Also it would be helpful if he can use the arm less often however, this is [his] livelihood, this is probably not feasible at this time, but this most likely represents strain "elbow tendonitis." The patient has full range of movement at this [time]. He states that Tylenol is helpful for this when this occurs." Id. (emphasis added). Dr. Fotieo noted she would consult with the plastic surgery department in order to have Cardenas evaluated and scheduled for surgery.

On **June 8, 2000**, Dr. Jon Wagner, Assistant Professor of the Division of Plastic and Reconstructive Surgery evaluated Cardenas for his left lower facial mass. Tr. 310-311. Cardenas reported he had the facial mass for approximately thirty years. Dr. Wagner advised that, since this was a long-standing lesion, non-surgical treatment was an option to consider. Tr. 311. Cardenas opted to have it surgically removed.

---

[5] As the Court previously noted, Cardenas had problems with his lumbar spine not his cervical spine.

On **June 27, 2000**, Dr. Wagner performed a pre-operative evaluation prior to removing Cardenas' facial lesion.  Tr. 308.

On **August 8, 2000**, Dr. Wagner performed the plastic surgery.  Tr. 305.  Dr. Wagner noted Cardenas was not systemically ill and was essentially a healthy individual and therefore there were no contraindications to performing the surgery.  *Id.*

On **December 19, 2000**, Cardenas returned to University Hospital Division of General Medicine.  Tr. 303-304.  Cardenas reported  no complaints and stated "he felt wonderful" and "[had] been exercising quite [a] bit and feels well."  Tr. 303 (emphasis added).  Cardenas' physical examination was essentially unremarkable.  Dr. Fotieo noted "right shoulder minimal pain and good range of motion."  Tr. 304 (emphasis added).  Dr. Fotieo instructed Cardenas to return in three months.

On **May 8, 2001**, Cardenas returned to University Hospital Division of General Medicine. Tr. 330.  Dr. Voss reported Cardenas had stopped taking his diabetic medication in September. *Id.*  Dr. Voss noted:

> SUBJECTIVE:  The patient is a 46 year old male with the above problems.  He has no complaints.  The patient continues to work out and keep active.  He is currently 149 pounds, down from his usual 155.  He states that he is actively trying to do this and is interested in still not doing anything for his diabetes.  We talked at today's visit about the importance of taking Lipitor for his diabetes as he is with and LDL of 146 which would be great in normal population, however, with diabetes this was a significant risk to add to coronary disease.  The patient states that he wanted to take this.  In addition, he is willing to take Glucophage again for his diabetes control.  We will wait to see what the Alc [is] to see whether the patient needs Glucotrol.  Otherwise, the patient states that he is doing well.

Tr. 330 (emphasis added).  Dr. Voss performed a physical examination that was essentially normal.  Dr. Voss prescribed Glucophage and Lipitor.  Tr. 331.  Dr. Voss instructed Cardenas to return in three months.

On **May 31, 2001,** Dr. G.T. Davis, an agency consultant, performed a consultative evaluation.  336-342.  For the first time, Cardenas reported his "back continues to bother him everyday."  Tr. 340.  Cardenas reported bending and lifting aggravated the back pain but he did not experience pain into his legs.  Cardenas also reported his right shoulder pain improved after having surgery.  Dr. Davis reviewed Cardenas' medical records.   Dr. Davis performed a physical examination and noted:

> PHYSICAL EXAMINATION:  He appeared to be alert and oriented.  His blood pressure was 118/88, pulse 80, height 67-1/4 inches, and weight 145-1/2 pounds. Corrected far vision, 20/20 on the right and 20/25 on the left; near vision, 20/70 on the right and 20/50 on the left.  Hearing and speech were intact.  His gait was somewhat stiff, but he otherwise, moved well without guarding.  He would take a few steps on his toes, heels, and squat down halfway.  Limb measurements of the upper and lower extremities were symmetrical.  He demonstrated a good mobility in the neck and mid back.  Voluntary movements in the lumbar region with forward bending 30 degrees, extension 10 degrees, and side bending 20 degrees.  Seated straight leg raising was negative.  There was no spasm or deformity in the lumbar spine.
>
> There was healed arthroscopy scars at the right shoulder, but he had good mobility of the shoulder, elbow, wrists, and digit joints.  Motor, sensory, and reflex functions in the upper extremities were symmetrical and hand functions were normal.
>
> In the lower extremities, he had good motion of the hips, knees, and ankles.  Vibratory sensations were intact and distal circulation was normal.
>
> Funduscopic examination did not show any hemorrhages or exudates or other signs of diabetic retinopathy.  I did not see any other sequela from diabetes.
>
> The examinee reports prior back injury and shoulder surgery in February 1999.  The clinical examination was unremarkable, and according to the records of his physician at UNMH, he has been doing well without complications.
>
> At his point, I do not see significant abnormal clinical findings of the neurological or orthopedic systems because (sic) of which it would be necessary to advise him to limit or restrict activities if he wish (sic) to do them.  Please correlate with any other records or documents.

Tr. 341 (emphasis added).  Dr. Davis also completed a Physical Findings and Range of Motion form.  Tr. 339.  Range of motion for the cervical and thoracic spine was normal.  Evaluation of

the lumbar spine indicated decreased flexion, extension and lateral flexion. *Id.* Straight leg raises were negative.

On **June 13, 2001**, Dr. Mark Werner, a non-examining agency consultant, completed a Physical RFC Assessment. Tr. 340-350. Dr. Werner opined Cardenas could lift 20 pounds occasionally, lift 10 pounds frequently, stand and/or walk about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and push and/or pull was unlimited. Tr. 344. Dr. Werner cited to the evidence to support his RFC. Dr. Werner noted:

> 47 y.o. male with allegations of disc disease, back pain, tendonitis, shoulder pain & diabetes. Hx of diabetes, which is maintained w/meds. No neuropathy, retinopathy or end organ damage. S/P R shoulder arthroscopy in 02/99 w/good results. Rt shoulder w/restored ROM and good function. Normal sensation & strength. Lumbar w/out spasms or deformity. "Voluntarily" limited lumbar flex to 30* (degrees). Gait stiff, but normal.
>
> 7/12/01 Medicine clinic note 5/16/00 "Mild spinal stenosis in two areas of cervical spine, asymptomatic." I believe his history is disc dessication @ L4-5, L5-S1 & small central disc herniation @ L4-5. "he is able to work well to lay bricks."

Tr. 344-345. Dr. Werner found no postural, manipulative, visual, communicative, or environmental limitations. Tr. 345-347. Dr. Werner opined Cardenas could perform light duty work. Tr. 348.

On **June 28, 2001**, Cardenas returned to see Dr. McRoberts. Tr. 355. Dr. McRoberts noted he had not seen Cardenas "in some time." In fact, the record indicates Dr. McRoberts had not seen Cardenas since March 1995. Tr. 257. Dr. McRoberts also noted Cardenas had not worked since 1991 and had been receiving Social Security Disability but was recently evaluated by a Social Security physician who felt he was able to return to work. Cardenas reported he was now experiencing pain in the "sacroiliac joint, right, with associated discomfort involving his posterior thigh to his knee, but not below." *Id.* Cardenas also reported taking Tylenol 2-3

13

tablets per day for pain control.  The physical examination indicated (1) decreased lumbar flexion and extension, (2) limitation of lumbar lateral bending bilaterally, and (3) limitation of lumbar rotation bilaterally.  *Id.*   The x-rays of the lumbosacral spine indicated "no significant abnormalities and there was no intervertebral narrowing."  *Id.*  Dr. McRoberts ordered an MRI and instructed Cardenas to return after the MRI results were in.  Tr. 356.  Dr. McRoberts did not prescribe any medication.

On **June 16, 2001**, Cardenas had the MRI of the lumbar spine.  The MRI findings indicated:

> The study is compromised by patient motion, particularly on the axial images.  There is degenerative disc and vertebral change at L4-5 and L5-S1 with small broad posterior disc herniation at L4-5 with very mild thecal sac compression.  There is also mild lateral recess compression secondary to the disc herniation and mild degenerative facet changes.
>
> At L5 S1, no significant disc herniation is seen.  Mild degenerative facet changes are also present but without significant foraminal or lateral recess stenosis.
>
> The rest of the lumbar spine shows normal signal and configuration of other intervertebral discs and normal appearance of the bony structures with normal bony alignment.  No other areas of stenosis are seen.  Partial visualization of the conus is normal with the conus ending at T12-L1.
>
> IMPRESSION:  Mild broad posterior disc herniation at L4-5 with mild lateral recess encroachment/stenosis, a combination of disc herniation and mild degenerative facet changes.

Tr. 357 (emphasis added).

On **June 23, 2001**, Cardenas returned to see Dr. McRoberts for his follow-up examination.  Tr. 354.  Cardenas was now complaining of numbness and weakness of his right thigh to his knee and reported taking Tylenol up to six tablets per day.  Dr. McRoberts noted the MRI results and diagnosed Cardenas as having lumbar disc disease at L4-5, L5-S1.  Dr. McRoberts opined Cardenas was unable to perform "construction type work that he was

performing previously." *Id.* Dr. McRoberts did not think surgery was indicated and recommended Cardenas continue taking Tylenol for pain control.

On **February 26, 2002**, Dr. McRoberts submitted a "To Whom It May Concern" letter, stating, "In my opinion, Mr. Cardenas is still unable to perform regular work duties. His lifting is limited to 20 pounds occasionally, 5 to 10 pounds on a frequent basis." Tr. 359.

The evidence indicates that, from **August 1999 to May 2001**, Cardenas did not complain about his back pain. In December 1999, Cardenas reported he felt he had been working "quite a bit laying cement" and felt well. Tr. 318. Cardenas also reported he continued doing his exercises and had no complaints. On March 7, 2000, Cardenas had no complaints and reported he continued to work well and his shoulder pain was almost gone. Tr. 316. On May 16, 2000, Cardenas had no complaints other than left elbow pain which was attributed to repetitive strain from laying bricks. Tr. 313. On that day, Dr. Fotieo advised Cardenas to use the arm less but noted this was not feasible since it was his livelihood. On December 19, 2000, Cardenas had no complaints and reported feeling wonderful and "had been exercising quite a bit and [felt] well." Tr. 303. On May 8, 2001, Cardenas had no complaints and reported he continued to work out and keep active.

Less than one month later, on May 31, 2001, Cardenas presented a different picture. He informed the agency consultant that his back continued to bother him daily. In addition, Cardenas' "voluntary" movements in the lumbar region indicated that forward flexion was only 30 degrees. However, on July 22, 1991, a few days after his back injury, Dr. McRoberts noted Cardenas' forward flexion as 55 degrees (Tr. 138), and on September 9, 1991, less than two months after his back injury, Dr. McRoberts noted Cardenas' forward flexion as 60 degrees (Tr.

134).  Dr. Davis also noted "[t]here was no spasm or deformity in the lumbar spine."  Tr. 341.

Additionally, seated straight leg raising was negative.

Having reviewed the entire record, the Court finds that the ALJ's decision that Cardenas

is not disabled is supported by substantial evidence.  The evidence indicates that Cardenas'

diabetes is well controlled, his right shoulder problem resolved with surgery, and from August

1999 to May 2001 Cardenas offered no complaints regarding his back problem and reported

engaging in activities that belie his recent complaints.  Moreover, although Cardenas lists some

evidence that may tend to support his disability claim, the determinative conclusion is that there is

also substantial evidence to support the ALJ's finding of no disability.  It is not this Court's role

on appeal from this agency determination to reweigh the evidence or to substitute its judgment for

that of the Commissioner.  *See Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1994).

## B.  Treating Physician Opinion

Cardenas contends [t]he ALJ has not demonstrated good cause to reject Dr. McRoberts'

opinions and evidence nor has he given legitimate reasons."  Pl.'s Mem. in Supp. of Pl.'s Mot. to

Reverse or Remand at 25.  Accordingly, Cardenas asserts the ALJ erred in failing to give

appropriate weight to Dr. McRoberts' opinions.

Generally, the ALJ must "give controlling weight to a treating physician's well-supported

opinion, so long as it is not inconsistent with other substantial evidence in the record."  *Drapeau

v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001).  A treating physician's opinion is considered

in relation to factors such as its consistency with other evidence, the length and nature of the

treatment relationship, the frequency of examination, and the extent to which the opinion is

supported by objective medical evidence.  20 C.F.R. § 404.1527(d) (1)-(6).  If the physician's

16

opinion is "brief, conclusory and unsupported by medical evidence," that opinion may be rejected.
*Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988).   If the opinion of the claimant's physician
is to be disregarded, specific legitimate reasons for this action must be set forth.  *Byron v.*
*Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984).  Moreover, a treating physician's opinion that a
claimant is totally disabled is not dispositive "because final responsibility for determining the
ultimate issue of disability is reserved to the [Commissioner]."   *Castellano v. Secretary of Health*
*& Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).

In this case, the ALJ found:

I am aware that the claimant's treating doctor wrote in February 2002 that he was still not able to perform regular duties. However, that physician did not state what he means by "regular duties," and in his earlier notes he stated that the patient could no longer do the construction work he was doing previously. His statement is conclusory, equivocal and confusing. His treatment notes indicate that the patient's condition is mild, and he has not found it advisable to prescribe pain medications to the claimant. The doctor's statements unequivocally establish only that the claimant has been unable to perform his past heavy construction work, and he does not give any opinion as to the claimant's capacities for light work. Nor does he provide specific recommendations for restrictions on the claimant's activities. As such, his opinion is not inconsistent with my finding that the claimant is capable of performing light work.

Tr. 19 (citations to the record omitted).

The ALJ gave specific legitimate reasons for disregarding Dr. McRoberts's opinion. It is not clear what Dr. McRoberts meant by "regular work duties." On July 23, 2001, Dr. McRoberts noted "I explained that I do not feel he is able to perform construction type work that he was performing previously." Cardenas may not have been capable of performing the duties his previous job required, however, this does not mean he is disabled. Additionally, Dr. McRoberts noted Cardenas had "mild" posterior bulging at L4-5. The operative question for disability benefits under the Social Security Act is whether Cardenas experiences **functional limitations** due to his impairments. *Gardner-Renfro v. Apfel,* No. 00-6077, 2000 WL 1846220, at * 3 (10th Cir. Dec. 18  2000). The evidence indicates Cardenas was not experiencing functional limitations to the degree required for a finding of disability.

Finally, although Cardenas takes issue with the ALJ's comment concerning Dr. McRoberts not prescribing pain medication, that is a proper factor to consider. The record indicates that Cardenas required frequent use of narcotic analgesics (Vicodin, Darvocet) at the

18

onset of his injury.  Tr. 116-135.  However, with time, he required little or no pain medication.

When Cardenas did take medication, it was over the counter pain medication.  Accordingly, the

Court finds that the ALJ has shown good cause for disregarding Dr. McRoberts' opinion.

## C.  The ALJ Followed Applicable Standards in Arriving at His Decision

      Cardenas contends the ALJ failed to apply the correct legal standard.  Cardenas contends

"[t]he ALJ erred in failing to analyze Plaintiff's pain and failing to address the issue of whether

jobs exist in the economy that he is capable of doing."  Pl.'s Mem. in Supp. of Mot. to Reverse

and Remand at 27.  The Court disagrees.  The ALJ considered Cardenas' allegations of pain and

found them not credible because they were not supported by the evidence.  Tr. 18.  The ALJ

considered the objective medical evidence, Cardenas' University Hospital treating physicians'

opinions, and Cardenas' subjective reports to those physicians.  Tr. 18-19.

      Cardenas also contends the ALJ was precluded from relying on the Medical-Vocational

Guidelines because of his nonexertional impairment, pain.   As a general rule the grids should not

be applied  conclusively "unless the claimant could perform the full range of work required of [the

pertinent RFC] category on a daily basis and unless the claimant possesses the physical capabilities

to perform most of the jobs in that range."  *Ragland v. Shalala*, 992 F.2d 1056, 1058 (10th Cir.

1993).  "[R]esort to the grids is particularly inappropriate when evaluating nonexertional

limitations such as pain."  *Id.*  The grids may, however, be used to direct a conclusion if the

claimant's nonexertional impairments do not significantly reduce the underlying job base.  *See*

*Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995)(holding that the ability to perform a

"substantial majority" of work in designated RFC category suffices for purposes of the grids).

This is because only significant nonexertional impairments limit the claimant's ability to do the full

range of work within a classification.  *See Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir. 1993).

In this case, the ALJ found Cardenas' allegations of pain to the degree alleged not credible.  "Because '[e]xaggerating symptoms or falsifying information for purposes of obtaining government benefits is not a matter taken lightly by this Court, 'we generally treat credibility determinations made by an ALJ as binding upon review."  *Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990).  Because the ALJ found Cardenas' pain did not significantly reduce the underlying job base, he was not precluded from relying on the grids.

## RECOMMENDED DISPOSITION

The ALJ's decision is supported by substantial evidence and he applied correct legal standards.  Accordingly, the ALJ's decision should be affirmed.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**

20

**<u>NOTICE</u>**

Within ten days after a party is served with a copy of these proposed findings and recommended disposition that party may, pursuant to 28 U.S.C. § 636 (b)(1), file written objections to such proposed findings and recommended disposition. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.