FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JAN 0 9 2004

Robert M. March
CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ADAN B. CARDENAS,

    Plaintiff,

vs.      No. 02cv1169 MV/DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Cardenas') Motion to Reverse or Remand Administrative Agency Decision [Doc. No. 7], filed April 9, 2003, and fully briefed on August 27, 2003. On October 23, 2003, the Honorable Don J. Svet, United States Magistrate Judge, filed his Proposed Findings and Recommended Disposition, finding the Commissioner's Administrative Law Judge (ALJ) applied correct legal standards and his decision was supported by substantial evidence. Magistrate Judge Svet also recommended the Court deny Cardenas' Motion to Reverse or Remand Administrative Agency Decision. On November 3, 2003, pursuant to 28 U.S.C. § 636(b)(1), Cardenas timely filed objections to the Proposed Findings and Recommended Disposition. On November 13, 2003, the Commissioner filed her response to Cardenas' objections. The Court has made a de novo determination of those portions of the findings and recommendation which Cardenas objects to, overrules those objections, and accepts the recommendation of Magistrate Judge Svet. *See* 28 U.S.C. § 636(b)(1)(C).



Cardenas objects to Magistrate Judge Svet's conclusion "that he didn't have any back problems." Pl.'s Objections to Magistrate Judge's Proposed Findings and Recommended Disposition at 1. Cardenas contends Magistrate Judge Svet erroneously relied on the medical evidence from UNM Hospital to infer that he had no complaints about back pain. Cardenas contends he received medical care from that facility "primarily for a shoulder problem that he was experiencing." *Id.* Cardenas received medical care from UNM Hospital from September 1999 until May 2001. Cardenas also argues Magistrate Judge Svet relied on measurements and evaluations made to his shoulder during that time period to arrive at his conclusion. According to Cardenas, Magistrate Judge Svet "may have even gone as far as relying on measurements of movement of the arm at the shoulder socket in order to reach a conclusion that the back was no longer in pain." *Id.* Cardenas further argues "[w]hen there are notations of 'he is doing well and has no complaints,' all of these pertain to the shoulder." *Id.* at 2.

The Court has reviewed the record and Magistrate Judge Svet's Proposed Findings and Recommended Disposition. Magistrate Judge Svet did not conclude that Cardenas did not have any back problems. Magistrate Judge Svet found "Cardenas' medical records from his treating physicians at University Hospital Department of Orthopedics and Department of Internal Medicine support the ALJ's finding that there has been medical improvement." Proposed Findings and Recommended Disposition at 7. Moreover, there is no confusion regarding the medical records addressing the shoulder impairment versus the back problem. Magistrate Judge Svet quoted the medical evidence <u>exactly</u> as it appears in Dr. Blevins' medical notes. It is patently clear from Dr. Blevins' medical notes that Dr. Blevins was discussing Cardenas' right shoulder adhesive capsulitis.

2

At the administrative hearing, Cardenas testified that he was unable to engage in substantial gainful activity due to his back pain (Tr. 39-42), diabetes (Tr. 42-43), and right arm and shoulder pain (Tr. 43-44). Accordingly, Magistrate Judge Svet summarized all of the medical evidence, not just the medical records from UNM Hospital, and emphasized where the objective medical evidence, the physicians' medical notes, and Cardenas' reports to the physicians did not support his allegations of disability stemming from his back pain, right arm and shoulder pain and diabetes.

In applying the eight-part sequential evaluation process used in termination reviews, the ALJ addressed whether Cardenas had experienced medical impairment and found:

> Moreover, although the claimant testified to severely restricted ranges of back motion and his consultative clinical examination found that he was unable to bend forward more than 30 degrees, that examination also indicated that the claimant voluntarily restricted himself to that range of bending (Exhibits B34 and B35). The claimant's lumbar x-rays revealed no significant abnormalities, and his lumbar MRI revealed only mild disc disease (Exhibit B37). Such mild diagnostic abnormalities do not support the degree of difficulty the claimant alleges due to his back and legs. At the time the claimant visited his doctor in June 2001, his doctor noted that he had not been in for some time. The claimant reported that he was taking only over the counter medication for pain, and his doctor did not prescribe any pain medications (Exhibit B37).
>
> The claimant underwent medical improvement as of June 1, 2001. At the time he was placed in disability status he had sustained a low back injury, he was experiencing severe back pain and pain radiating into his leg, he had marked restrictions of shoulder motions, he was having difficulties sleeping due to pain, he was unable to maintain any postural position, and he was unable to do any significant bending and lifting. The evidence substantiates that he has currently been doing cement work, which involves bending and at least light lifting, that he performs light household chores, that his shoulder surgery restored his range of motion, and that his back condition is very mild. He has been working out and keeping active. His treatment records indicate that he has reported he is feeling fine to his doctor or a regular basis.

Tr. 19. Magistrate Judge Svet reviewed the evidence and concluded that the ALJ's finding that Cardenas had experienced medical improvement was supported by substantial evidence. The Court agrees.

3

Cardenas' contention that any notations of "he is doing well and has no complaints" found in his medical records from his treating physicians at UNM Hospital is not a proper inference that "he has no complaints about back pain" because he was not being treated for his back at UNM Hospital is without merit. The Court notes that at the administrative hearing Cardenas testified that he had seen a doctor at UNM hospital once or twice for his back and went to a chiropractor "when he gets hurt." Tr. 39. With the assistance of an interpreter, Cardenas' attorney questioned him regarding what he meant by "when he gets hurt." Cardenas explained that "when he stumbles and falls or he turns the wrong way, it hurts him a lot. And he is sore for a while so he's got to go back to, like, the chiropractor and be, you know, have a massage done or be straightened. " *Id.* In response to his attorney's question regarding how often this happened, Cardenas stated he "gets hurt easily." *Id.* Cardenas' attorney then asked him what happened when his back went out. Cardenas responded that "he's got to go to the doctor to be- to have some massage done because he gets real hard- like stuff, like a rock." *Id.*

As Magistrate Judge Svet noted in his findings, Cardenas sought treatment for his lower back pain from Dr. Hiring, a chiropractor, on three occasions, July 18, 2000, July 21, 2000, and January 10, 2001. On June 28, 2001, Dr. McRoberts, the physician who initially treated Cardenas for his back problem, noted he had not seen Cardenas "in some time." Tr. 355. The record indicates Cardenas had not seen Dr. McRoberts since **March 1995**. And, although Cardenas contends the Court should ignore the records from UNM Hospital because they concern only his shoulder problem, the records indicate Cardenas received medical care at UNM Hospital for all his health care needs.

4

For example, on September 2, 1999, Dr. Fred Hashimoto, Professor of Medicine in the Department of Internal Medicine and in the Division of General Medicine at UNM Hospital, evaluated Cardenas for (1) diabetes mellitus, (2) hyperlipidemia, (3) erectile dysfunction, (4) right shoulder capsulitis status repair with pain, and (5) mild spinal stenosis in two areas in the cervical spine. Tr. 320-321.

Dr. Hashimoto, as an internist, assessed all of Cardenas' problems and treated them accordingly. Dr. Hashimoto ordered a hemoglobin A-1C in order to determine whether Cardenas needed to increase the Gluophage to 1,000 mg twice a day and referred him for an eye examination. Dr. Hashimoto determined Cardenas did not have any problems with his hypertension. As to the erectile dysfunction, Dr. Hashimoto prescribed Viagra. Because Cardenas was still complaining of pain of the right shoulder, Dr. Hashimoto prescribed Tylenol No. 3 (contains 30 mg of codeine and 300 mg of acetaminophen). However, Cardenas denied taking the Tylenol No. 3 every day. Tr. 321. Cardenas reported he only needed the Tylenol No. 3 occasionally. *Id.*

Dr. Hashimoto also noted Cardenas had **mild spinal stenosis** in two areas in the cervical spine. As Magistrate Judge Svet pointed out, Cardenas' medical history indicates his problem is with the lumbar not cervical spine. This is supported by the record. Dr. Mark Werner, an agency non-examining consultant, completed a Physical Residual Functional Capacity Assessment on June 13, 2001. Tr. 343-350. Dr. M. Z. Yoder, also an agency non-examining consultant, reviewed the evidence, affirmed Dr. Werner's assessment, and noted "medicine clinic note 5/16/00 'mild spinal stenosis in two areas of cervical spine, asymptomatic.' I believe his history is disc desiccation @ L4-5, L5-S1, & small central disc herniation @ L4-5." Tr. 345. However,

5

Cardenas offered no complaints regarding any back problem. Dr. Hashimoto questioned Cardenas about his smoking habits, and Cardenas reported he was still trying to quit.

Thus, Cardenas' contention that he was receiving treatment primarily for his shoulder problem at UNM Hospital is not supported by his visit to Dr. Hashimoto. Dr. Blevins, Associate Professor of Orthopedics at UNM Hospital, was the physician who treated Cardenas for his right shoulder adhesive capsulitis. After undergoing surgery for this problem, Dr. Blevins evaluated Cardenas on August 13, 1999, and advised Cardenas to return only if necessary. Tr. 322. Dr. Hashimoto and other physicians in the Department of Internal Medicine and in the Division of General Medicine managed Cardenas' health care needs, one of which was his progress after his surgery for right shoulder adhesive capsulitis after Dr. Blevins opined that he did not need to see Cardenas unless problems developed.

Additionally, on December 7, 1999, Cardenas visited Dr. Carolyn Voss, also a physician in the Division of General Medicine. Tr. 318. Dr. Voss also listed the same medical problems as Dr. Hashimoto, i.e., diabetes mellitus, hyperlipidemia, erectile dysfunction, right shoulder capsulitis status post repair with pain, and mild stenosis in 2 areas of cervical spine. At that time, Cardenas reported he had no complaints and that he was doing well. Significantly, Cardenas reported "working quite a bit laying cement." *Id.*

Cardenas continued to return to the University Hospital Division of General Medicine for follow-up care as instructed. On March 7, 2000, Cardenas had nothing new to report. Tr. 316-317. Cardenas reported he continued to work well and offered no complaints. *Id.* His physical examination was unremarkable. *Id.*

6

However, on May 16, 2000, Cardenas returned for his follow-up care and presented with two new problems. Tr. 312-314. On that day, Cardenas complained of left elbow pain. *Id.* Dr. Dana Fotieo listed all of Cardenas problems, ie., diabetes mellitus, hyperlipidemia, erectile dysfunction, right shoulder capsulitis status post repair, and mild spinal stenosis, asymptomatic. Tr. 312. Dr. Fotieo noted Cardenas had the "above problems" and was in for a follow-up visit but had no complaints. *Id.* Dr. Fotieo noted Cardenas had no polydypsia, polyuria, or neuropathy, all symptoms of uncontrolled diabetes. However, Dr. Fotieo then noted "[t]he patient does complain that he has a left lateral condyle pain which basically hurts only with pressing it." *Id.* Cardenas told Dr. Fotieo that he did not recall bumping his elbow. Cardenas reported that he found the pain a bit annoying, but he was still able to work well laying bricks. Tr. 313.

Notably, on that same day, Cardenas also reported a growth on his right lower chin. *Id.* Dr. Fotieo noted "The patient also has a lipoma on his right lower chin which he would like evaluated and removed" and "for which he has asked for a consult." *Id.* Cardenas' physical examination was essentially normal except for left elbow tenderness over the lateral condyle projection. Dr. Fotieo's assessment and plan were as follows:

Well controlled diabetic male without any complaints.

1. Diabetes: Continue with current medications at this time.

2. Hyperlipidemia: Continue with Lipitor 10 mg, his goal.

3. Left lateral condyle pain. Most likely represents repetitive strain. I explained to the patient that he would be best to ice this 2x a day for 20 minutes at a time. Also it would be helpful if he can use the arm less often however, this is [his] livelihood, this is probably not feasible at this time, but this most likely represents strain "elbow tendonitis." The patient has full range of movement at this time. He states that Tylenol is helpful for this when this occurs.

7

4. Smoking was discussed, the patient is still not interested in quitting. Although, he states that he does smoke less. Stated that the cigarette smoking is still pretty dangerous and it can increase his risk of heart disease which along with diabetes it is elevated. I will continue to recommend that he quit smoking.

5. Lipoma on the face, will consult with plastic surgery to evaluate and to schedule the patient for surgery.

6. Health care maintenance: Up to date.

Tr. 313. This visit clearly demonstrates Cardenas understood that he could present any medical problems he had to the physicians at University Hospital Division of General Medicine, and, in fact, he did. He had no problem reporting his left elbow pain and his concerns with the growth on his face to Dr. Fotieo.

Dr. Fotieo referred Cardenas to Dr. Wagner, Assistant Professor of the Division of Plastic and Reconstructive Surgery to have the growth evaluated. On June 8, 2000, Dr. Wagner evaluated Cardenas' facial growth and advised him that the lipoma did not need to be removed. However, Cardenas opted to have surgery. Cardenas returned to see Dr. Wagner on June 27, 2000, and had surgery on August 8, 2000.

On December 19, 2000, Cardenas returned to University Hospital Division of General Medicine. Tr. 303-304. On that day, Cardenas had no complaints and stated" he felt wonderful" and "[had] been exercising quite [a] bit and feels well." Tr. 303.

Cardenas did not return to University Hospital Division of General Medicine until May 8, 2001. At that time, Cardenas offered no complaints and reported that "he continues to work out and keep active." Tr. 330. However, a few days later, on May 31, 2001, for the first time, Cardenas complained of back pain during his consultative evaluation with Dr. G.T. Davis.

8

The Court finds that the records from University Hospital Division of General Medicine do not support Cardenas' argument that "[w]hen there are notations of 'he is doing well and has no complaints,' all of these pertain to the shoulder." Pl.'s Objections at 2. During the time Cardenas received treatment at University Hospital Division of General Medicine, he presented with various health problems and never complained of back pain. The record is clear that Cardenas saw a chiropractor three times for his back problem and did not return to seek medical care from Dr. McRoberts from 1995 to 2001. Cardenas' argument that he experienced disabling back pain during the time he was receiving treatment for his right shoulder at UNM Hospital but failed to mention it because he was only being treated for his shoulder problem is disingenuous. Accordingly, the Court finds that the ALJ's finding that Cardenas had undergone medical improvement as of June 1, 2001, is supported by substantial evidence.

Plaintiff also objects to Magistrate Judge Svet's finding as to the treating physician's opinion. In his decision, the ALJ found:

> I am aware that the claimant's treating doctor wrote in February 2002 that he was still not able to perform regular duties (Exhibit B38). However, that physician did not state what he means by "regular duties," and in his earlier notes he stated that the patient could no longer do the construction work he was doing previously (Exhibit B37). His statement is conclusory, equivocal and confusing. His treatment notes indicate that the patient's condition is mild, and he has not found it advisable to prescribe pain medications to the claimant. The doctor's statements unequivocally established only that the claimant has been unable to perform his past heavy construction work, and he does not give any opinion as to the claimant's capacities for light work. Nor does he provide specific recommendations for restrictions on the claimant's activities. As such, his opinion is not inconsistent with my finding that the claimant is capable of performing light work.

Tr. 19. Exhibit B37, cited by the ALJ in his decision, is a July 23, 2001 evaluation by Dr. McRoberts. Tr. 364. Dr. McRoberts' medical notes indicate he advised Cardenas that he did "not feel [Cardenas] is able to perform construction type work that he was performing

9

previously." *Id.* Exhibit B38, also cited by the ALJ in his decision, is a February 26, 2002 letter submitted by Dr. McRoberts, opining Cardenas "is still unable to perform regular work duties. His lifting is limited to 20 pounds occasionally, 5 to 10 pounds on a frequent basis." Tr. 359. The lifting restrictions imposed by Dr. McRoberts are consistent with the lifting requirements for light work. *See* 20 C.F.R. § 1567(b). However, as the ALJ noted, Dr. McRoberts did not restrict Cardenas' capacity to walk, stand, sit, push, or pull. Therefore, the ALJ found Dr. McRoberts' opinion "not inconsistent with [his] finding that Cardenas [was] capable of performing light work." Tr. 19.

The objective medical evidence indicates that Cardenas' June 28, 2001 lumbosacral spine x-rays showed "no significant abnormalities" and "no intervertebral space narrowing." Tr. 355. An MRI was done on July 16, 2001 and indicated only mild encroachment. Tr. 357. Dr. Akiya noted the MRI study was compromised by "patient motion." *Id.* The MRI findings were as follows:

> There is degenerative disc and vertebral change at L4-5 and L5-S1 with **small broad posterior disc herniation at L4-5 with very mild thecal sac compression.** There is also **mild lateral recess compression secondary to the disc herniation and mild degenerative facet changes.**
>
> At L5-S1, **no significant disc herniation is seen. Mild** degenerative facet changes are also present but **without significant foraminal or lateral recess stenosis.**
>
> The rest of the lumbar spine shows normal signal and configuration of other intervertebral discs and normal appearance of the bony structures with normal bony alignment. No other areas of stenosis are seen. Partial visualization of the conus is normal with the conus ending at T12-L1.

Tr. 357. On July 23, 2001, Cardenas returned for his follow-up and for his MRI results. Tr. 354. Dr. McRoberts noted the MRI results as "This study shows desiccations at two levels, L4-5, L5S1, mild posterior bulging, L4-5." *Id.* Dr. McRoberts advised Cardenas that he could not

10

perform construction type work which is considered medium to heavy work, but placed no other restrictions.

On May 31 2001, Dr. G.T. Davis evaluated Cardenas. Tr. 340-342. Dr. Davis performed a physical examination and found it unremarkable. Tr. 341. Dr. Davis opined, "At this point, I do not see significant abnormal clinical findings of the neurological or orthopedic systems because of which it would be necessary to advise him to limit or restrict activities if he wish[es] to do them." *Id.*

The ALJ's findings regarding Dr. McRoberts' opinion are supported by substantial evidence. The ALJ also gave the proper weight to Dr. McRoberts' opinion and gave specific, legitimate reasons for his decision.

Cardenas also contends Magistrate Judge Svet erroneously relied on the lack of prescription pain medication and evidence that Cardenas was engaging in work activity to affirm the ALJ's finding that his complaints of disabling pain were not credible. Specifically, Cardenas contends Magistrate Judge Svet chose to reject Dr. McRoberts' opinion because Dr. McRoberts had not been prescribing pain medication. Cardenas contends he had been taking "Tylenol 3" which "contains codeine, a narcotic." Pl.'s Objections at 5. In support of this contention, Cardenas cites to his testimony at the administrative hearing when he testified that his doctor prescribed Tylenol No. 3 after his injury in 1991. Cardenas may have taken Tylenol No. 3 at the time of his injury, however, at the time he saw Dr. McRoberts on June 28, 2001, he was taking Tylenol. The record indicates that on that day, which was Cardenas' first visit to Dr. McRoberts since 1995, Dr. McRoberts noted that Cardenas reported taking "Tylenol, 2-3 tablets per day for pain control." Tr. 355. Tylenol is an over-the-counter analgesic. Dr. McRoberts also noted,

11

"No medications were prescribed today." Tr. 356. Thus, the record does not support Cardenas' statement that he was taking Tylenol No. 3 for pain control at the time he returned to see Dr. McRoberts on June 28, 2001. Moreover, the record indicates that when Cardenas was taking Tylenol No. 3 for his right shoulder pain, he took it sparingly. Tr. 321.

Cardenas also contends he "is at a loss to explain the statements contained in the UNM Hospital records regarding his "engaging in some type of work activity." Pl.'s Objections at 5. The record is clear that on December 7, 1999, Dr. Voss noted:

> The patient is a 46-year-old male with the above problems who comes in today for a follow-up visit. He has no complaints. He states he is doing well. He feels that he has been working quite a bit laying cement and he states he feels well. He is able to move his shoulder much more. He continues to do his exercises and has no complaints. He states that he checks his sugars in the morning and they are around 130. He does forget to bring in a sheet with listings.

Tr. 318. On March 7, 2000, Cardenas returned for his three month follow-up visit. Tr. 316-317. Dr. Voss noted "he continues to work well and his shoulder pain is almost gone. Tr. 316 (emphasis added). Cardenas had no complaints and the physical examination was unremarkable. On May 16, 2000, Dr. Fotico also noted that although Cardenas complained of left elbow pain, he was able to work well laying bricks. Tr. 312-314. Dr. Fotieo informed Cardenas that the left elbow pain was most likely "repetitive strain" and advised him to use the arm less often but recognized that since this was his livelihood this was probably not feasible. Tr. 312. There are other notations concerning Cardenas' activity level which belie his complaints of disabling pain. For example, on December 19, 2000, Cardenas reported "he felt wonderful" and "[had] been exercising quite [a] bit and feels well." Tr. 303-304. And, on May 8, 2001, Cardenas reported "no complaints" and "continues to work out and keep active." Tr. 330.

12

Cardenas does not contend he was misunderstood or that these notations in his medical records were erroneously recorded, only that he is at a loss to explain these references. These statements weigh heavily against Cardenas' credibility. As the ALJ found, "[Cardenas'] testimony and reports of symptoms and functional restrictions [were] not supported by the evidence overall in the disabling degree alleged, and therefore lacked credibility." Tr. 18. It is not this Court's role on appeal from this agency determination to reweigh the evidence or to substitute its judgment for that of the Commissioner. *See Hargis v. Sullivan,* 945 F.2d 1482, 1486 (10th Cir. 1994). Substantial evidence supports the ALJ's credibility determination.

Finally, Cardenas contends the ALJ was precluded from conclusively relying on the grids to arrive at his decision. Pl.'s Objections at 5. As a general rule the grids should not be applied conclusively "unless the claimant could perform the full range of work required of [the pertinent RFC] category on a daily basis and unless the claimant possesses the physical capabilities to perform most of the jobs in that range." *Ragland v. Shalala,* 992 F.2d 1056, 1058 (10th Cir. 1993). "[R]esort to the grids is particularly inappropriate when evaluating nonexertional limitations such as pain." *Id.* The grids may, however, be used to direct a conclusion if the claimant's nonexertional impairments do not significantly reduce the underlying job base. *See Evans v. Chater,* 55 F.3d 530, 532 (10th Cir. 1995)(holding that the ability to perform a "substantial majority" of work in designated RFC category suffices for purposes of the grids). This is because only significant nonexertional impairments limit the claimant's ability to do the full range of work within a classification. *See Thompson v. Sullivan,* 987 F.2d 1482, 1488 (10th Cir. 1993).

The ALJ found Cardenas' allegations of pain to the degree alleged not credible. As Magistrate Judge Svet recognized in his Proposed Findings and Recommended Disposition, "Because '[e]xaggerating symptoms or falsifying information for purposes of obtaining government benefits is not a matter taken lightly by this Court, 'we generally treat credibility determinations made by an ALJ as binding upon review." *Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990). Accordingly, because the ALJ found Cardenas' pain did not significantly reduce the underlying job base, he was not precluded from relying on the grids.

Based on the foregoing, the Court finds the ALJ's decision is supported by substantial evidence and he applied correct legal standards. Accordingly, the ALJ's decision is affirmed.

A judgment in accordance with this Memorandum Opinion shall be filed.

MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE